Humphrey L. **SHUFORD**,
et al., Plaintiffs,

v.

**ALABAMA STATE BOARD OF EDUCATION, et al., Defendants.**

**Civil Action No. 89–T–196–N.**

United States District Court,
M.D. Alabama,
Northern Division.

Sept. 8, 1997.

tion or attempted transaction in violation of . . . section 1956 of this title, or any property traceable to such property[.]"

Terry G. Davis, Terry G. Davis, P.C., Montgomery, AL, Mark Englehart, Anita L. Kelly, Kenneth Lamar Thomas, Thomas, Means & Gillis, P.C., Montgomery, AL, A. Wesley Pitters, Montgomery, AL, for Humphrey L. Shuford.

James U. Blacksher, Leslie Proll, Birmingham, AL, John C. Falkenberry, Sirote & Permutt, Birmingham, AL, Joe R. Whatley, Jr., Cooper, Mitch, Crawford, Kuydendall & Whatley, Birmingham, AL, for Connie Johnson.

James U. Blacksher, Birmingham, AL, Maureen Kane Berg, Andrew Clay Allen, Joe R. Whatley, Jr., Cooper, Mitch, Crawford, Kuydendall & Whatley, Birmingham, AL, for Karen Newton.

Terry G. Davis, Terry G. Davis, P.C., Montgomery, AL, Anita L. Kelly, Kenneth Lamar Thomas, Thomas, Means & Gillis, P.C., Montgomery, AL, for Kenneth A. Brackins.

Thomas T. Gallion, III, Haskell, Slaughter, Young, Johnston & Gallion, Montgomery, AL, Beverly P. Baker, Richard H. Walston, Rebecca H. Hunt, Michael K.K. Choy, Haskell, Slaughter, Young, Johnston & Gallion,

Birmingham, AL, for Myra P. Davis, Sheryl B. Threatt.

Terry G. Davis, Terry G. Davis, P.C., Montgomery, AL, Solomon S. Seay, Jr., Montgomery, AL, Mark Englehart, Anita L. Kelly, Kenneth Lamar Thomas, Thomas, Means & Gillis, P.C., Montgomery, AL, A. Wesley Pitters, Montgomery, AL, for Thad C. McClammy.

J. Allen Schreiber, Gerald Alan Templeton, Catherine L. Hogewood, Tessa M. Thrasher, Lloyd, Schreiber & Gray, P.C., Birmingham, AL, Anthony A. Joseph, Helen Kathryn Downs, Johnston, Barton, Proctor & Powell, Birmingham, AL, William H. Pryor, Jr., Office of Atty. Gen., Montgomery, AL, Renee Culverhouse, Office of Gen. Counsel, State of Ala., Dept. of Postsecondary Educ., Montgomery, AL, R. Scott Clark, Fitzgerald, Cooper & Clark, Birmingham, AL, for Alabama State Bd. of Educ., Fred Gainous.

J. Allen Schreiber, Gerald Alan Templeton, Lloyd, Schreiber & Gray, P.C., Birmingham, AL, Anthony A. Joseph, Helen · Kathryn Downs, Johnston, Barton, Proctor & Powell, Birmingham, AL, William H. Pryor, Jr., Office of Atty. Gen., Montgomery, AL, for John M. Tyson, Jr., Stedman Shealy, Jr., Isabelle Thomasson, Spencer Bachus, Victor Poole, Evelyn S. Pratt.

J. Allen Schreiber, Gerald Alan Templeton, Catherine L. Hogewood, Lloyd, Schreiber & Gray, P.C., Birmingham, AL, Anthony A. Joseph, Helen Kathryn Downs, Johnston, Barton, Proctor & Powell, Birmingham, AL, William H. Pryor, Jr., Office of Atty. Gen., Montgomery, AL, for Ethel Hall, Willie Paul.

Randall C. Morgan, Hill, Hill, Carter, Franco, Cole & Black, Montgomery, AL, Jeffrey A. Foshee, Foshee & Associates, Montgomery, AL, J. Allen Schreiber, Gerald Alan Templeton, Catherine L. Hogewood, Tessa M. Thrasher, Lloyd, Schreiber & Gray, P.C., Birmingham, AL, Anthony A. Joseph, Birmingham, AL, William H. Pryor, Jr., Office of Atty. Gen., Montgomery, AL, for Larry McCoy, Bevill State Community College, Harold Wade.

Randall C. Morgan, Hill, Hill, Carter, Franco, Cole & Black, Montgomery, AL, J. Allen Schreiber, Gerald Alan Templeton,

Lloyd, Schreiber & Gray, P.C., Birmingham, AL, William H. Pryor, Jr., Office of Atty. Gen., Montgomery, AL, for Northwest Shoals Community College, Betty Fine Collins, Tazewell Shepherd, Dan Cleckler.

Jeffrey A. Foshee, Foshee & Associates, Montgomery, AL, J. Allen Schreiber, Gerald Alan Templeton, Catherine L. Hogewood, Tessa M. Thrasher, Lloyd, Schreiber & Gray, P.C., Birmingham, AL, Anthony A. Joseph, Birmingham, AL, William H. Pryor, Jr., Office of Atty. Gen., Montgomery, AL, for Lawson State Community College, Perry W. Ward.

William H. Pryor, Jr., Office of Atty. Gen., Montgomery, AL, for Northwest Alabama Community College, Secretary of State Bennett, Probate Judges of Alabama.

Gerald Alan Templeton, Catherine L. Hogewood, Tessa M. Thrasher, Lloyd, Schreiber & Gray, P.C., Birmingham, AL, Anthony A. Joseph, Helen Kathryn Downs, Johnston, Barton, Proctor & Powell, Birmingham, AL, William H. Pryor, Jr., Office of Atty. Gen., Montgomery, AL, for Fob James, Bradley Byrne, G. J. Higginbotham, Stephanie Bell, David F. Byers, Jr., Sandra Ray, Mary Jane Caylor.

Gerald Alan Templeton, Catherine L. Hogewood, Lloyd, Schreiber & Gray, P.C., Birmingham, AL, Anthony A. Joseph, Helen Kathryn Downs, Johnston, Barton, Proctor & Powell, Birmingham, AL, William H. Pryor, Jr., Office of Atty. Gen., Montgomery, AL, for Earl Roberson, Trenholm State Technical College.

James M. Parker, Jr., Johnston, Barton, Proctor & Powell, Birmingham, AL, Raymond P. Fitzgerald, Jr., Fitzgerald, Cooper & Clark, Birmingham, LA, for Jamie C. Moncrief, Thomas L. Davis.

*MEMORANDUM OPINION*

MYRON H. THOMPSON, Chief Judge.

On March 23, 1995, Dr. Fred Gainous, an African–American who is Chancellor of Postsecondary Education, recommended to the Alabama State Board of Education that plaintiff-intervenor Thad McClammy, also an African–American, be terminated as presi-

dent of Trenholm State Technical College. The State Board voted 8–1 to terminate Dr. McClammy. The only vote against termination was cast by Dr. Willie Paul, one of two African–Americans on the Board, and whose district includes Trenholm State. Dr. McClammy filed a complaint-in-intervention in this lawsuit claiming that he was terminated as President of Trenholm State because he is African–American. He named as defendants the State Board, Chancellor Gainous, Governor Fob James, and the members of the State Board. Dr. McClammy charges that defendants violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17, the due-process clause of the fourteenth amendment to the United States Constitution, as enforced through 42 U.S.C.A. § 1983, and a consent decree resolving class-wide claims in this litigation. The case is now before the court on defendants' motion for summary judgment, filed February 5, 1996. For the reasons that follow, the motion will be granted.

## I. STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115–17 (11th Cir.1993) (discussing how the responsibilities on the movant and the nonmovant vary depending on whether the legal issues, as to which the facts in question

pertain, are ones on which the movant or nonmovant bears the burden of proof at trial). In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## II. BACKGROUND

This long-running lawsuit involves class actions alleging race and gender discrimination in the employment practices of Alabama's postsecondary educational system. The United States District Court for the Middle District of Alabama has approved a partial consent decree resolving the race discrimination claims and a second partial consent decree resolving the discrimination claims brought by women. *See Shuford v. Alabama State Bd. of Educ.,* 846 F.Supp. 1511 (M.D.Ala.1994) ("*Shuford I*"); *Shuford v. Alabama State Bd. of Educ.,* 897 F.Supp. 1535 (M.D.Ala.1995) ("*Shuford II*") On April 21, 1995, Dr. McClammy filed his complaint-in-intervention in this lawsuit challenging his termination as President of Trenholm State in Montgomery as violating, among other things, Title VII, the due-process clause of the fourteenth amendment, and a consent decree resolving class-wide claims in *Shuford I.*[1]

The facts in the light most favorable to Dr. McClammy are as follows. Dr. McClammy was appointed President of Trenholm State Technical College in Montgomery in 1981.[2] At the time of Dr. McClammy's appointment, the position of Chancellor of the Department of Postsecondary Education did not exist, and the postsecondary colleges were supervised by the State Superintendent of Education.[3] In July 1988, Dr. Fred Gainous was appointed as Chancellor of the Department of Postsecondary Education.[4] The presi-

---

1. Dr. McClammy also raised a claim under § 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973c, which was handled by a three-judge court. *Shuford v. Alabama State Bd. of Educ.,* 920 F.Supp. 1233 (M.D.Ala.1996).

2. Deposition of McClammy at 28, Exhibit A to brief in support of defendants' motion for summary judgment.

3. *Id.* at 28, 30.

4. Affidavit of Gainous at ¶ 6, Exhibit B to defendants' motion for summary judgment.

dents of the two-year colleges report to the Chancellor, who makes recommendations to the State Board of Education.[5] The Chancellor cannot fire a president himself but can recommend to the State Board that a president be terminated.[6]

In late 1992, the Department of Examiners of Public Accounts began an audit of the finances of Trenholm State covering the four-year period from October 1, 1988, through September 30, 1992.[7] Approximately two years after the audit began, a draft report was released alleging serious financial mismanagement at the institution.[8] Dr. McClammy was given time to respond to the report.[9] On January 27, 1995, Dr. McClammy submitted a response and met with representatives of the Department of Public Examiners to dispute portions of the report.[10] As a result of the meeting, two findings were removed from the draft report.[11] On February 10, 1995, the Department issued its final report, which found a pervasive pattern of mismanagement at Trenholm State.[12] The audit report found 24 questioned costs of federal expenditures, which added up to a total of $817,640.79. On ten of those questioned costs, the college failed to comply with state laws and regulations for expenditures. As a result, those questioned costs were charged directly against Dr. McClammy in the amount of $577,672.08. The report also found violations of the following 16 state and federal laws and regulations:

(1) 1975 Code of Alabama § 41–1–6 (failure to make regular inventory of nonconsumable property);

(2) 1975 Code of Alabama § 41–16–50 (failure to obtain competitive bidding for expenditures over a threshold amount);

(3) 1975 Code of Alabama § 39–1–1 (failure to execute a performance bond before entering into a construction contract over a threshold amount);

(4) 1975 Code of Alabama § 39–2–2 (failure to advertise for sealed bids prior to entering into any contract for public improvement over a threshold amount);

(5) 1975 Code of Alabama § 36–25–5 (use of a public position for personal financial gain);

(6) 1975 Code of Alabama § 36–7–21 (failure to obtain authorization in writing by the governor prior to official travel out of state);

(7) 34 C.F.R. § 75.503 (use of grant funds for obligations outside grant period);

(8) 34 C.F.R. § 80.32 (failure to establish appropriate safe-guards for protection of equipment acquired for use in a federal project);

(9) 34 C.F.R. § 608.10 (use of federal funds for activities not included in grantee's application);

(10) Office of Management and Budget Circular No. A–21 § J.20 (housing allowances are not permitted);

(11) Office of Management and Budget Circular A–110, attachment F (financial management system did not have accounting records with source documentation);

(12) Office of Management and Budget Circular A–110, attachment O (use of "cost-plus-a percentage-of-cost" method of contracting not allowed);

(13) 34 C.F.R. § 75.603 (use of federal funds for construction without having full title or access to site for at least 50 years);

(14) 34 C.F.R. § 75.604 (failure to have sufficient funds to meet any non-federal share of the cost of constructing a facility);

---

**5.** Deposition of Ethel Hall at 23, 62, Exhibit D to defendants' motion for summary judgment.

**6.** *Id.* at 64.

**7.** Deposition of McClammy at 258; Gainous affidavit at ¶ 3

**8.** *See* audit report, Exhibit B–1 to defendants' motion for summary judgment.

**9.** *Id.* at 6 (page C).

**10.** *Id.; see also* exhibit 31 to the audit report (copy of letter).

**11.** *Id.* at C.

**12.** *Id.*

(15) Procedures manual for State Two Year Colleges (release of items before work order is paid in full); and

(16) 1901 Constitution of Alabama, § 93, as amended by Amendment No. 58 (taking an interest in a private enterprise or lending a college's credit to a private enterprise).

Three days after the report was issued, Chancellor Gainous placed Dr. McClammy on paid administrative leave.[13] Chancellor Gainous assembled an assessment team of 19 individuals from his office and other post-secondary institutions to investigate the allegations and assess the overall status of Trenholm State.[14] The assessment team evaluated Trenholm State in the five functional areas of business operations, computer services, student services, instructional services, and personnel.[15] The team issued a detailed 53–page report which found hundreds of major problems at Trenholm State and made over 110 recommendations for improving operations. The report concluded that business operations were "highly inadequate," and "the management of cash appears to be one of the weakest areas in the college business operation." [16] For example, the college was owed over $672,000 in student receivables.[17] For the last four months of 1994, no student receivables were processed at all.[18] The college had previously been "seriously" behind in the routine submission of Pell Grant reports, which had created a cash flow problem.[19] The audit estimated that the college would end the fiscal year in debt of up to $750,000.[20] The auditors stated that the "business office had

no organization of outstanding invoices," which were "physically tossed into three cardboard boxes" and were not paid in a timely manner.[21] Some invoices dated back to previous fiscal years.[22] The college owed $320,000 in outstanding invoices, including $27,000 to the Alabama Power Company.[23] In addition, the college had failed to pay its insurance premiums for buildings and personal property and was facing cancellation until it paid the premiums five months late.[24]

The report also showed major personnel problems. For example, a number of employees did not even have written contracts and were paid on an oral contract basis.[25] Although security guards are armed, they have no training in the use of deadly force.[26] Although seven persons are assigned to take care of buildings and grounds, "none possesses technical skills to perform basic repair and maintenance." [27] Despite seven people on staff to take care of buildings, a private contractor was employed to clean some of the restrooms.[28] The report was equally negative about other areas of the college and found a "pervasive lack of organization in the management of the instructional and academic support services of the College." [29] Overall, the report concluded that "Trenholm State Technical College is suffering greatly from a lack of leadership from a managerial standpoint."[30]

After reviewing the report of the assessment team, Chancellor Gainous offered Dr. McClammy an administrative position at the Department of Postsecondary Education,

---

13. Gainous affidavit at ¶ 5.

14. Report of the Functional Assessment Teams at 1, Exhibit B–3 to defendants' motion for summary judgment.

15. *Id.* at 1.

16. *Id.* at 6, 12.

17. *Id.* at 6.

18. *Id.*

19. *Id.* at 9.

20. *Id.*

21. *Id.* at 7.

22. *Id.*

23. *Id.*

24. *Id.* at 12.

25. *Id.* at 4.

26. *Id.* at 11.

27. *Id.*

28. *Id.*

29. *Id.* at 12, 47.

30. *Id.* at 53.

which Dr. McClammy declined.[31] On March 3, 1995, Chancellor Gainous sent Dr. McClammy a letter directing him to respond to the questioned costs in the final audit report.[32] The letter also advised Dr. McClammy that "you may also wish to have your legal counsel present" at the upcoming State Board meeting because "Matters regarding your involvement in the management and operation of Trenholm State Technical College may be discussed."[33] Chancellor Gainous engaged in ongoing discussions with Dr. McClammy's attorneys and communicated to the attorneys that he would allow Dr. McClammy to resign before the Board meeting.[34]

On March 23, 1995, the State Board held a public meeting.[35] Dr. McClammy publicly addressed the Board, as did others on his behalf.[36] The Board then convened into executive session because Dr. McClammy's good name and character were at issue.[37] After the executive session, Chancellor Gainous recommended that Dr. McClammy be terminated, and the Board approved Chancellor Gainous's recommendation.[38] Following its decision to terminate him, Dr. McClammy spoke to the Board regarding his accomplishments at Trenholm State, and the Board advised Dr. McClammy that he was entitled to a hearing to clear his name.[39] On the same day, Thomas Carruthers, an attorney for the Board, sent a letter to Dr. McClammy's attorneys stating that Dr. McClammy had a right to request a post-termination hearing to clear his name.[40]

## III. DISCUSSION

Dr. McClammy contends that his termination violated Title VII because a number of white junior college presidents who engaged in similar misconduct were allowed to resign with retirement benefits, while he was never offered a retirement package. In addition, those presidents were not placed on paid administrative leave during the investigation of their institutions. Dr. McClammy also alleges that defendants violated his procedural and substantive due-process rights as well as the consent decree in *Shuford I*.

### A. Title VII Claim

■ Title VII prohibits an employer from discriminating against employees on the basis of race. 42 U.S.C.A. § 2000e–2(a)(1). A plaintiff may prove race discrimination through either direct or circumstantial evidence. There is disagreement among the circuits and within the Eleventh Circuit as to how to define direct evidence of discrimination.[41] In *Caban–Wheeler v. Elsea*, 904 F.2d 1549, 1554 (1990), the Eleventh Circuit adopted a fairly broad definition of direct evidence, stating that "direct evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation of the employee." However, in *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1223 (11th Cir.1993), the court opted for a much narrower definition, stating that "[E]vidence is direct when it is sufficient to prove

---

**31.** *Id.* at ¶ 8.

**32.** Exhibit B–5 to defendants' motion for summary judgment.

**33.** *Id.*

**34.** At a telephone status conference on April 17, 1996, Dr. McClammy's attorneys clarified that the offer to Dr. McClammy was not made directly to him but was made to some of his "handlers." Dr. McClammy does not contend that he was unaware of the option to resign but contends that it was presented "in the context of resign or be fired." *See* transcript of telephone conference at 16–18.

**35.** Gainous affidavit at ¶ 13.

**36.** Hall deposition at 81, 94.

**37.** Minutes of the State Board Meeting, Exhibit B–6 to defendants' motion for summary judgment.

**38.** *Id.*

**39.** *Id.*

**40.** Exhibit B–7 to defendants' motion for summary judgment.

**41.** A recent commentator on the confusion over direct evidence stated that many circuits have "enshrouded their holdings in a semantic haze, which partially obscures the scope of their definitions of direct evidence." Robert Brookins, *Mixed–Motives, Title VII, and Removing Sexism from Employment: The Reality and the Rhetoric*, 59 Alb. L.Rev. 1, 86 (1995).

discrimination without inference or presumption. Only the most blatant remarks whose intent could be nothing other than to discriminate constitute direct evidence." (citations omitted). Most recently, in *Haynes v. W.C. Caye & Co., Inc.*, 52 F.3d 928, 930 (11th Cir.1995), the court held in an age discrimination case that a supervisor's question whether "a sweet little old lady could get tough enough with customers and collect the money" constituted direct evidence of discrimination, even though the woman was subsequently hired by the supervisor who made the statement. The court in *Haynes* did not articulate the definition of direct evidence it applied. *See also Merritt v. Dillard Paper Company*, 120 F.3d 1181 (11th Cir.1997) (statement by employer's president to employee that employee's deposition was "most damning" to employer's case in co-worker's Title VII proceeding and that employee no longer had place at employer, was direct evidence of retaliation).

If confronted with direct evidence of discrimination, a trial court must assess the plaintiff's claim as follows: "[T]he trial judge must initially make a credibility finding as to whether or not plaintiff's proffered direct evidence of discrimination is to be believed.... The trial court must also make a finding of fact as to whether or not the decision maker 'relied upon [race]-based considerations in coming to its decision.' ... In other words, the fact finder must determine whether [the impermissible factor] played a motivating part in an employment decision.... If the trial court both credits the direct evidence and finds that the evidence played a substantial role in the employment decision at issue, then the defendant can avoid liability only by proving that it would have made the same decision even if it had not allowed such discrimination to play a role." *Haynes*, 52 F.3d at 932 (*quoting Price Waterhouse v. Hopkins*, 490 U.S. 228, 242,

244, 109 S.Ct. 1775, 1786, 1804, 104 L.Ed.2d 268 (1989)).

In this case, Dr. McClammy contends that a statement by Chancellor Gainous constitutes direct evidence of discrimination. In his deposition, Chancellor Gainous stated that, beginning in 1988, a number of white presidents were terminated for financial mismanagement, while Dr. McClammy was not terminated despite similar reports of mismanagement at Trenholm State. Chancellor Gainous further stated that among board members, these actions "created an atmosphere of discussion that—that the chancellor would readily fire whites but would not fire anyone black." [42] Even under the broadest definition, this second statement does not constitute direct evidence of discrimination. Although it reflects consciousness of race by some members of the Board, it does not reflect a discriminatory attitude. If anything, the statement reflects an attitude that Dr. McClammy should be treated in the same way as white presidents guilty of similar misconduct. Furthermore, the statement does not indicate either race consciousness or a racially discriminatory attitude on the part of Chancellor Gainous, who investigated Dr. McClammy and recommended to the Board that Dr. McClammy be fired. Therefore, the court concludes that the statement does not constitute direct evidence of discrimination.

Dr. McClammy may still prove discrimination through circumstantial evidence. The employee has the initial burden of establishing by a preponderance of the evidence a prima-facie case. Many different articulations of this prima-facie case exist. The parties agree that the articulation most applicable to this case was established by the Eleventh Circuit in *Jones v. Gerwens*, 874 F.2d 1534, 1539 (11th Cir.1989).[43] Under that standard, a plaintiff must show that he is a member of a protected class and either did not engage in misconduct or "that he engaged in misconduct similar to that of a person outside the protected class, and that

**42.** Deposition of Gainous at 77.

**43.** In *Cooper–Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 n. 4 (1994), the Eleventh Circuit stated that the holding in *Jones* "applies only in Title VII case in which a plaintiff has not been terminated and therefore cannot show that he or she was replaced by a person outside of the

protected class." However, in this case, a permanent replacement has not yet been named for Dr. McClammy, and he cannot show he was replaced by a person outside the protected class. Therefore, the court will apply the *Jones* framework for establishing a prima-facie case.

the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct." *Id.* at 1540. The "burden is on [the plaintiff] 'to show a similarity between [his] conduct and that of white employees who were treated differently and not on the [the defendant] to disprove their similarity.'" *Id.* at 1541 (*quoting Tate v. Weyerhaeuser Co.,* 723 F.2d 598, 603 (8th Cir.1983), *cert. denied,* 469 U.S. 847, 105 S.Ct. 160, 83 L.Ed.2d 97 (1984)). *Jones* does not define what constitutes "similar misconduct." In *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185 (1984) (*quoting Davin v. Delta Air Lines, Inc.,* 678 F.2d 567, 570 (5th Cir. Unit B 1982)), the Eleventh Circuit stated that to establish a prima-facie case, plaintiff must show " 'that the misconduct for which [he] was discharged was nearly identical to that engaged in by [an employee outside the protected class] whom [the employer] retained.'" The *Nix* "nearly identical" test has been used in a number of recent disparate discipline cases in the Eleventh Circuit. *See Jones v. Frank,* 718 F.Supp. 931, 933 (S.D.Fla.1989); *Trumbull v. Health Care & Retirement Corp. of Am.,* 756 F.Supp. 532, 538 (M.D.Fla.), *aff'd,* 949 F.2d 1162 (11th Cir.1991) (table); *Lewis v. Zilog, Inc.,* 908 F.Supp. 931, 954 (N.D.Ga. 1995).

If established, the prima-facie case raises a presumption that the employer is liable to the employee under Title VII. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this approach, known as the *McDonnell Douglas* approach, the burden then shifts to the employer to rebut the presumption by producing sufficient evidence to raise a genuine issue of fact as to whether the employer took unlawful actions against the employee. The employer can meet this burden of production by articulating a legitimate, nondiscriminatory reason for the employment decision, a reason which is clear, reasonably specific, and worthy of credence. The rebuttal burden is one of production only, and the employer does not have to persuade the court that it was actually moti-

vated by the proffered reason. *Burdine,* 450 U.S. at 253–55, 101 S.Ct. at 1093–94. Once the employer satisfies this burden of production, the focus shifts to the employee's ultimate burden of proving by a preponderance of the evidence that the employer's proffered reason for its employment decision is a pretext for discrimination. The employee may meet this burden by persuading the factfinder either *directly* that a discriminatory or retaliatory reason more than likely motivated the employer or *indirectly* that the proffered reason for the employment decision is not worthy of belief. *Id.* at 256, 101 S.Ct. at 1095.

However, where, as in this case, the court has sufficient evidence to determine whether an employee has been a victim of discrimination, the court need not go through the *McDonnell Douglas* burden-shifting process and should instead reach the ultimate issue of discrimination. "If . . . the defendant has succeeded in carrying its burden of production, the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant. . . . The presumption, having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11, 113 S.Ct. 2742, 2746, 125 L.Ed.2d 407 (1993). *See also United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983); *Powers v. Alabama Dep't of Educ.,* 854 F.2d 1285, 1290 (11th Cir.1988), *cert. denied,* 490 U.S. 1107, 109 S.Ct. 3158, 104 L.Ed.2d 1021 (1989).

Moreover, the Supreme Court announced the *McDonnell Douglas* approach before the 1991 amendments to Title VII. Under *McDonnell Douglas,* the burden of persuasion never shifts from the employee or plaintiff. However, under the 1991 amendments, to establish liability, the employee need only show "that race . . . was a motivating factor for any employment practice, even though other factors also motivated the practice," 42 U.S.C.A. § 2000e–2(m), and then, to avoid the full array of remedies, the employer must "demonstrate [ ] that [it] would have taken the same action in the absence of the imper-

missible motivating factor." 42 U.S.C.A. § 2000e–5(g)(2)(B).

Nonetheless, the *McDonnell Douglas* analysis may still be helpful in fully tried cases to which the 1991 amendments apply and in which the employee relies on circumstantial evidence. Such cases pose "difficult" and "sensitive" issues of subjective intent and objective action. *Aikens,* 460 U.S. at 716, 103 S.Ct. at 1482. The *McDonnell Douglas* analysis provides an invaluable method of "progressively ... sharpen[ing] the inquiry into the elusive factual question of intentional discrimination." *Burdine,* 450 U.S. at 255, n. 8, 101 S.Ct. at 1094, n. 8. Positing such elementary *McDonnell Douglas* questions as whether the elements for a prima-facie case are present (in particular, whether the plaintiff was treated differently from a similarly situated person of a group different from that to which the plaintiff belongs), the clarity and nature of the employer's justification, and whether the justification is pretextual and, if so, whether it is a pretext for discrimination, would help to assure that, in resolving the Title VII claim—and, in particular, in resolving the ultimate issues of whether race was a motivating factor for the decision by the employer, even though other factors also motivated the employer, and whether the employer would have taken the same adverse employment action against the employee even in the absence of the impermissible factor, 42 U.S.C.A. §§ 2000e–2(m), 2000e–5(g)(2)(B), the court arrives at its ultimate conclusions less through intuition and more through factual reasoning and analysis. *See, e.g., Noble v. Alabama Dept. of Envtl. Management,* 872 F.2d 361, 365 n. 4 (11th Cir. 1989). However, because the *McDonnell Douglas* analysis is only a "procedural device," *St. Mary's Honor Ctr.,* 509 U.S. at 521, 113 S.Ct. at 2755, it should not be applied too rigidly; nor should it be viewed as an end in itself. For example, the mere disbelief of the employer's proffered reason does not "compel" a finding of discrimination. *Id.* at 510–12, 113 S.Ct. at 2749. In other words, the *McDonnell Douglas* approach should not be used by the court as a "substitute" for determining, on a case-by-case basis, whether the evidence is or is not sufficient to allow the factfinder to conclude that the employee has, in fact, been a victim of discrimination. *Moore v. Alabama State University,* 864 F.2d 103, 105 (11th Cir.1989).

Defendants contend that Dr. McClammy has not offered sufficient evidence to establish a prima-facie case of disparate discipline under the *Jones* framework, which requires that Dr. McClammy demonstrate that the "disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct." 874 F.2d at 1539. They further contend, under the *Nix* framework, that he has not shown that his misconduct was "virtually identical" to the misconduct of others who were more severely disciplined. 738 F.2d at 1185.

■ In this case, Dr. McClammy provides evidence through the deposition of Chancellor Gainous and the affidavit of James McEwen. The parties dispute whether the statements in McEwen's affidavit comply with Rule 56(e) of the Federal Rules of Civil Procedure, which requires that affidavits offered in support or opposition to summary judgment "set forth such facts as would be admissible" at trial. The court agrees with the defendants that the statements are deficient, for, other than the conclusory comment that "I ... personally observed the situation" of a number of others, McEwen does not say what the source of his knowledge is. It is obvious from his statements that McEwen was not personally around to observe everything about which he testifies. In any event, however, even assuming that all of McEwen's affidavit complies with Rule 56(e), Dr. McClammy still has not produced sufficient evidence to satisfy his burden of showing that individuals who allegedly received retirement benefits and were not placed on paid-administrative leave engaged in a similar level of misconduct.

*1. Mike Arban.* Arban is a white male who served as President of Nunnelly Technical College until he resigned in 1982. McEwen states in his affidavit that there were "serious allegations of substantial mismanagement and lack of institutional controls substantiated by examiners of the institu-

tions' records." McEwen also states that there was considerable negative publicity surrounding the allegations and that Arban was indicted.

The description of Arban's misconduct does not specify what allegations were made against him or whether they were ever proven. Furthermore, there is no evidence as to what Arban was indicted for or whether he was ever convicted. Therefore, the court concludes that such a vague description of Arban's alleged misconduct does not provide sufficient information to demonstrate that Arban's misconduct was as serious as Dr. McClammy's.

*2. Charles Byrd.* Byrd served as president of Wallace State College in Selma until his retirement effective on December 31, 1988. In his affidavit, McEwen states that "there were serious allegations of financial mismanagement and misconduct against Byrd.... For example, Mr. Byrd rarely, if ever, submitted budgets to the Board in a timely manner." McEwen further states that on some occasions, Byrd failed to produce any books and records for auditors to examine. In addition, McEwen states that "it was widely reported in news accounts that [Byrd] was charged with public drunkenness while on state business" which resulted in an automobile accident while driving a state-owned automobile. In his deposition, Chancellor Gainous stated Byrd was also involved in building a theater on campus that incurred major cost overruns and required the State Board to amend the budget twice so that the project could be completed.[44]

Although there is evidence that Byrd engaged in misconduct in wrecking the automobile and mismanagement in the construction of the theater, there is no evidence that a pervasive pattern of mismanagement occurred similar to the pattern at Trenholm State. McEwen states that serious allegations were made against Byrd but does not state what those allegations were other than the failure to produce records for an audit and failure to submit budgets in a timely manner. Therefore, the court concludes that there is insufficient evidence to determine that Byrd engaged in misconduct as egregious as Dr. McClammy's.

*3. Wiley Salter.* Salter is a white male who served as president of Reid Technical College until he resigned effective December 31, 1991. In his affidavit, McEwen states that "allegations of financial mismanagement, live work, nepotism, and other allegations of misconduct were rampant for several years." McEwen further states that "When charges of wrongdoing were made against Mr. Salter, the Board justified his conduct by suggesting that the Board's rules were unclear." The court finds that these allegations regarding Salter's misconduct are too vague to determine whether the misconduct was as serious as Dr. McClammy's. Dr. McClammy has not produced sufficient evidence for the court to determine what rules were violated and whether the Board acted fairly in justifying Salter's conduct.

*4. James Sasser.* Sasser is a white male who retired from his position as President of Alabama Aviation Technical College on April 1, 1988. In his affidavit, McEwen states that "there was considerable negative publicity surrounding [Sasser's] tenure as president and serious allegations of mismanaging state aircraft of the Aviation College." This statement is non-specific and establishes only that there were allegations of wrongdoing, not that wrongdoing was ever found. Therefore, the court concludes there is not sufficient evidence to demonstrate that Sasser's wrongdoing was as serious as Dr. McClammy's.

*5. Nathan Hodges.* Hodges is a white male who retired from his position as President of Wallace State Community College, Dothan in December of 1990. In his affidavit, McEwen alleges that there was "heated controversy" surrounding Hodges's presidency because of "allegations of fraudulent claiming of state funds for non-existing classes and frequent and arbitrary personnel changes and resulting low morale" at the college. McEwen also states that, after Hodges retired, the Board created a high paying position for him and then bought out his contract when a public controversy ensued.

---

**44.** Deposition of Gainous at 88–89.

The court concludes that even if all of McEwen's statements regarding Hodges are true and admissible, they do not establish that Hodges was guilty of misconduct. McEwen states only that there were "allegations" of fraud, but not that any fraud was ever found or proven. Therefore, Dr. McClammy cannot demonstrate that Hodges engaged in a similar level of misconduct.

*6. Tommy Booth.* Booth is a white male who resigned as president of Brewer State Junior College on August 15, 1988. In his affidavit, McEwen states that Booth resigned amid "allegations of failing to show up at school, lack of institutional controls, and general mismanagement." This description of the misconduct is too vague to determine whether it was comparable in severity to Dr. McClammy's. Furthermore, there is no evidence that any of the allegations were proven. Therefore, the court concludes that Booth cannot be compared to Dr. McClammy for disparate discipline purposes.

*7. Larry McCoy.* McCoy is president of the Northwest–Shoals Community College and is a white male. Dr. McClammy produced an audit report from the State Department of Examiners showing that the college failed to list two notes payable of $300,000 as liabilities of the college and also found that it failed to list a $350,000 lease agreement as a liability. Thus, the auditors determined that the college's liabilities were understated by $950,000. The auditors corrected the mistakes so that the accounting system properly reflects the liabilities of the college. Dr. McClammy also produced an affidavit from Johnny Mack Morrow, a business and economic instructor at Northwest State, who alleges that the loans were used to pay for "expenses which were the result of long-running mismanagement by Larry McCoy."[45] A close review of the two reports reveals that, while auditors found two major accounting errors at Northwest State, they did not find the pervasive pattern of misman-agement that existed at Trenholm State. The findings of accounting irregularities and legal violations at Trenholm State were specific and extensive. The auditors at Trenholm State found 24 different questioned costs of federal expenditures, for a total of $817,640.79. On ten of those questioned costs, the college failed to comply with state laws and regulations for expenditures. As a result, those ten were included in the charges against officials including $577,672.08 charged directly against Dr. McClammy. The report also found violations of 16 state and federal laws and regulations.

In contrast, the audit of Northwest revealed only one legal violation.[46] There were no questioned expenses, and no expenses were charged back against officials of the college. While Morrow contends that McCoy has engaged in longstanding misconduct, his description is extremely vague. Morrow does not specify what the misconduct involved or how long it occurred. Therefore, the court concludes that Booth is not comparable for disparate discipline purposes.

Finally, it is important to remember that it is Chancellor Gainous who made the recommendation to terminate Dr. McClammy, and that it was Chancellor Gainous's recommendation upon which the State Board relied. Therefore, because much of the evidence from McEwen predates Chancellor Gainous's tenure, it cannot serve a basis for the critical determination of whether Chancellor Gainous acted with discriminatory intent. Moreover, for those events that occurred during Chancellor Gainous's tenure, McEwen provides little, to no, details of Chancellor Gainous's involvement.

Based on the evidence presented by Dr. McClammy in opposition to summary judgment, the court concludes that he has not met his burden of showing that any other postsecondary college president engaged in a level of misconduct 'similar' to his own, as required by *Jones*. Furthermore, Dr.

---

**45.** This affidavit was submitted after the summary-judgment discovery deadline. In addition, there is a question as to whether Morrow's allegations would be admissible at trial and comply with Rule 56(e). However, the court believes that even if all of the allegations in the affidavit are considered as evidence in opposition to sum-mary judgment, Dr. McClammy still fails to establish a prima-facie case.

**46.** By lending its credit, Northwest violated the 1901 Alabama Constitution, § 93, as amended by Amendment No. 58.

McClammy certainly has not shown that any president engaged in misconduct 'virtually identical' to his own, as required by *Nix.* Therefore, Dr. McClammy has failed to establish a prima-facie case.

■ Even if Dr. McClammy were able to establish a prima-facie case, he still would not able to establish that the reason given for his termination was a pretext for race discrimination. The legitimate non-discriminatory reason provided by Chancellor Gainous is that he relied on the assessment report which showed "(1) ineffective/and or inefficient administration of essential college operation and function; (2) non-compliance and violations of State Board of Education policies, applicable Alabama Code provisions, and federal laws and regulations; (3) ineffective or no internal controls; and (4) expenditure of state and federal moneys at Trenholm State Technical College without required authorization." [47] The Board members testified that although some read the reports, they were largely relying on the recommendation of Gainous that Dr. McClammy be terminated.[48]

Once the defendants articulate a legitimate non-discriminatory reason, the burden shifts to the plaintiff to demonstrate pretext. To show pretext, plaintiff must show that defendants' "proffered reason is not credible and that [defendants] discriminated against him" because of his race. *Bechtel Construction Co. v. Secretary of Labor,* 50 F.3d 926, 934 (11th Cir.1995); *see also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511 n. 4, 113 S.Ct. 2742, 2749 n. 4, 125 L.Ed.2d 407 (1993).

Dr. McClammy makes six arguments why defendants' proffered reasons are pretextual: [49] (1) defendants did not rely on the audit report in their decision to terminate Dr. McClammy, and the assessment teams were not formed as a result of the audit report; (2) defendants' reasons lacks clarity and specificity in that they do not establish how the Chancellor exercised his discretion to discipline similarly situated college presidents; (3) in their depositions, the State Board members did not point to anything specific in the assessment report that convinced them to terminate Dr. McClammy but instead relied upon the recommendation of the Chancellor; (4) the charge from the Chancellor to the assessment team does not say anything about the allegations in the audit report, but Chancellor Gainous stated in his affidavit that he assembled the team in response to the audit report; (5) the findings of the assessment team are not credible because they are conclusions and assertions developed during just a two-day examination; and (6) the findings of the assessment team are not credible because it used a format parallel to standards used by accreditation associations, and Trenholm State has never lost its accreditation.

After reviewing these arguments by Dr. McClammy, the court concludes that none of them demonstrate that defendants' proffered reasons are not credible. Dr. McClammy does not offer any evidence disputing the accuracy of the findings of the report. Instead of attacking the substance of the report, Dr. McClammy attempts to show inconsistencies and irregularities in the procedure in which the assessment process occurred. In addition, Dr. McClammy argues that the report contains "assertions" but does not say what assertions he is referring to and why they are inaccurate. After closely reviewing the report, the court concludes that it is thorough, detailed, and fact-intensive. The report examines 49 separate areas of the college, makes hundreds of detailed observations, and makes over 110 specific recommendations to improve college operations. These observations document and fully support the report's overall finding that a pervasive pattern of mismanagement and poor leadership existed at Trenholm State. Given the extensive details of mismanagement in the report, the court does not find it unusual that State

---

**47.** Letter to McClammy's attorneys dated March 23, 1995, included as Exhibit B–7 to defendants' motion for summary judgment.

**48.** Deposition of Caylor at 10–11; Deposition of Ray at 33; Deposition of Byrne at 10–11; Deposition of Higginbotham at 32.

**49.** Plaintiff-intervenor McClammy's memorandum brief in opposition to defendant's motion for summary judgment at 30–35.

Board members could not point to a single area of the report that convinced them to terminate Dr. McClammy. It is credible that Board members relied on the recommendation of the Chancellor, whose primary job is to determined whether institutions in the postsecondary system are being properly managed.

The fact that Chancellor Gainous relied on the assessment report rather than the audit report does not diminish the credibility of his reasons. Furthermore, it is not inconsistent for Chancellor Gainous to say that he assembled the assessment team after reading the audit report, but did not charge the assessment team with reviewing the findings of the audit report. Chancellor Gainous may have wanted the assessment team to engage in independent fact-finding so that he could determine whether its findings were consistent with those of the audit report.

Dr. McClammy argues that there is a material issue of fact because Gainous has not shown how he exercises his discretion to discipline presidents accused of similar misconduct. However, the Eleventh Circuit has stated that in disparate discipline cases, the "burden is on [the plaintiff] 'to show a similarity between [his] conduct and that of white employees who were treated differently and not on the [the defendant] to disprove their similarity.'" *Jones*, 874 F.2d at 1541 (*quoting Tate v. Weyerhaeuser Co.*, 723 F.2d 598, 603 (8th Cir.1983), *cert. denied*, 469 U.S. 847, 105 S.Ct. 160, 83 L.Ed.2d 97 (1984)). At the summary judgment stage, the non-movant must produce additional evidence to correct a deficiency on an issue on which it has the burden at trial. *Fitzpatrick*, 2 F.3d at 1116. Because Dr. McClammy has failed to produce evidence that another president engaged in misconduct similar to his, the question of how Gainous exercised his disciplinary powers is not material to this case.

Finally, the fact that Trenholm State has not lost its accreditation does not establish that the assessment team report is unreliable. The report made no determination as to whether Trenholm State was in danger of losing its accreditation. Furthermore, there is no requirement that the institution be in such a severe state of mismanagement that it lose its accreditation before the Chancellor and Board can act to remove its president.

Overall, the court concludes that the legitimate nondiscriminatory reasons proffered by defendants are credible. Even if the reasons were not credible, Dr. McClammy has not produced sufficient evidence from which the court could make a finding of racial discrimination. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir.1997) ("[A] plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer."). The only evidence produced by Dr. McClammy relating to race is that Chancellor Gainous stated there was "an atmosphere of discussion" among Board members that the Chancellor, who is black, would fire white presidents guilty of misconduct but would not fire black presidents guilty of misconduct.[50] This statement does not indicate a sentiment that Dr. McClammy should be treated differently from other presidents because of his race, but rather that he should be treated the same. In addition, Dr. McClammy has also failed to show that this "atmosphere of discussion" was a factor in Chancellor Gainous's recommendation to terminate him or the State Board's decision to follow the recommendation.

Because Dr. McClammy has failed to demonstrate that defendants' proffered legitimate non-discriminatory reasons are not credible and he has failed to produce sufficient evidence from which the court could make a finding of discrimination, the court concludes that defendants' reasons were not a pretext for race discrimination. Therefore, the court will grant summary judgment on Dr. McClammy's Title VII claim.

### B.  *Due-Process Claims*

▉ Dr. McClammy contends that his termination deprived him of his procedural and substantive due-process rights. An employee is entitled to procedural due process if he has a property interest in his position. *Bish-*

---

**50.**  Deposition of Gainous at 77.

op v. Wood, 426 U.S. 341, 343–47, 96 S.Ct. 2074, 2076–79, 48 L.Ed.2d 684 (1976). A property interest exists if an employee "has a legitimate claim of entitlement to continued employment." *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). Such a claim can exist through a "mutually explicit understanding" with the employer that "support[s] a claim of entitlement." *Id.* A court should look to state law in determining whether an employee had a property interest. *Warren v. Crawford*, 927 F.2d 559, 561 (11th Cir.1991); *Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976).

■ Under Alabama law, a state employee who can be terminated at-will does not have a property interest. *Green v. City of Hamilton Hous. Auth.*, 937 F.2d 1561, 1564 (11th Cir.1991). Alabama state law gives the State Board of Education the power to "Appoint the president of each junior college and trade school, each president to serve at the pleasure of the board."[51] The Alabama Supreme Court has held that this statutory language "makes it clear that the presidents of Alabama's junior colleges are at-will employees of the Board of Education." *DeWitt v. Gainous*, 628 So.2d 418, 420 (Ala.1993). Therefore, as a post-secondary college president, Dr. McClammy is considered an at-will employee.

■ Dr. McClammy specifies four independent grounds under which his at-will status was modified so that he possessed a property interest in his position: (1) his employment contract; (2) the Alabama State Board of Education Policy Manual; (3) the Alabama Fair Dismissal Act; and (4) his raising of an inference of race discrimination. Dr. McClammy alleges that his contract provides just-cause protection. However, he has failed to produce any evidence of a written contract. Furthermore, Chancellor Gainous testified in his deposition that junior college presidents are not provided written contracts.[52] Therefore, Dr. McClammy has no property interest arising from an employment contract.

■ Dr. McClammy also alleges that he obtained a property interest from his employee handbook. Under Alabama law, an employee's at-will status can be altered when "the language contained in a[n] [employee] handbook can be sufficient to constitute an offer to create a binding unilateral contract" between the employee and employer. *Hoffman–La Roche v. Campbell*, 512 So.2d 725, 735 (Ala.1987); *see also Lassiter v. Alabama A & M Univ.*, 28 F.3d 1146, 1151 n. 6 (11th Cir.1994) (recognizing the "implied-contract-from personnel manual theory" under Alabama law). In *Hoffman–La Roche*, an employee was fired when he was too ill to satisfactorily perform. 512 So.2d at 727. The employee was fired despite the fact he had been told by his supervisor not to take advantage of sick leave benefits available to him. The company's employee handbook spelled out various disciplinary policies and "the language of the handbook stated that the policies and practices of [the company] would be 'applied fairly.'" *Id.* at 739 (*quoting* the handbook). The Alabama Supreme Court found that such language created an implied contract with an obligation of good faith and fair dealing. The court further stated that, "Given this language, it cannot be said that it was within the reasonable expectation of the parties that [plaintiff] could be discharged for unsatisfactory performance when he was not physically capable of satisfactorily performing."

In interpreting Alabama law on whether language in handbooks can create a property interest, the Eleventh Circuit has stated that "It is on the substantive restrictions on the employer's discretion to discharge, rather than on the procedural protections provided, that the existence of a property interest is based." *Green v. City of Hamilton Hous. Auth.*, 937 F.2d 1561, 1565 n. 2 (11th Cir. 1991). This holding is consistent with the United States Supreme Court's prior statement that "'Property' cannot be defined by the procedures provided for its deprivation." *Cleveland Bd. of Educ. v. Loudermill*, 470

---

**51.** 1975 Alabama Code § 16–60–111.4(2).

**52.** Gainous deposition at 61, exhibit C to defendants' motion for summary judgment.

U.S. 532, 541, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985).

In this case, Dr. McClammy contends that he was not given 60 days notice before his termination. Alabama State Board of Education policy 607.01(1.1) states that "In the event that a president's appointment is to be discontinued, such president shall be given a minimum of sixty (60) days' notice." Dr. McClammy therefore argues that by violating its own internal procedures, the Board modified his at-will employment status and conferred a property interest in his position. However, the 60–day notice requirement does not in any way limit the Board's discretion to make the decision to terminate, but instead limits the timing of the actual termination. In contrast, the handbook in *Hoffman–La Roche* spelled out various disciplinary policies, and stated that the policies and practices of [the company] would be "applied fairly." Therefore, the court concludes that the 60–day notice period is a procedural rather than substantive restriction and does not provide Dr. McClammy with a property interest in his position.

■ Dr. McClammy also contends that his employment-at-will status is affected by the Alabama Fair Dismissal Act, which establishes restrictions on the termination of state employees. 1975 Alabama Code §§ 36–26–100 through 36–26–108. However, as a post-secondary college president, Dr. McClammy was not covered by the Act. The coverage provisions of the Act state that "Only full-time employees who are not otherwise covered by the state merit system, the teacher tenure law, or other state statute at the time this article is adopted are intended to be covered by this article." § 36–26–100. At the time the Alabama Fair Dismissal Act was adopted, junior college presidents were

already covered by § 16–60–111.4, which provided that they served "at the pleasure" of the State Board of Education.[53] Because junior college presidents were covered by another statute at the time the Alabama Fair Dismissal Act was passed, the Act does not apply to Dr. McClammy and cannot provide him with a property interest in his position.[54]

■ As a final argument that he has a property interest, Dr. McClammy contends that, because he has created "an inference that race discrimination was a factor in his termination, this abrogates the application of the doctrine of employment-at-will."[55] However, the case Dr. McClammy cites to support such a proposition states the exact opposite. In *Howard v. Wolff Broad. Corp.*, 611 So.2d 307, 308 (Ala.1992), *cert. denied*, 507 U.S. 1031, 113 S.Ct. 1849, 123 L.Ed.2d 473 (1993), it was undisputed that a female disc jockey at a radio station was "fired [by the radio station] solely because she was female." The plaintiff contended that because the radio station was governed by Federal Communications Commission guidelines stating that it would not discriminate on the basis of sex, it had created a unilateral contract similar to the one in *Hoffman–LaRoche* and had modified her employment-at-will status. *Id.* at 309–310. The court held otherwise, stating that "we cannot hold that the provisions of this federal regulation transformed [the plaintiff's] at-will employment relationship with [the defendant]." *Id.* at 311. Because the Alabama Supreme Court in *Howard* refused to modify the employment-at-will doctrine even when faced with an undisputed violation of a federal non-discrimination regulation, this court concludes that an inference of race discrimination in this case would not alter Dr. McClammy's employment-at-will employment status under state law.[56] Hence, the court concludes that Dr. McClam-

---

**53.** Dr. McClammy acknowledged in his deposition that the case he believed provided him with a property right in his position, *Dickey v. McClammy*, 452 So.2d 1315 (1984) applied to a coordinator level position and not to a presidential position. *See* McClammy deposition at 40–41, Exhibit A to defendants' motion for summary judgment.

**54.** Section 16–60–111.4 was adopted in 1982 as part of Act No. 82–486, p. 805 § 6. The coverage provisions of the Alabama Fair Dismissal Act

were adopted in 1983 as part of Act No. 83–644, p. 1004 § 1.

**55.** Plaintiff-Intervenor McClammy's memorandum brief in opposition to defendants' motion for summary judgment, filed March 12, 1996, at 40.

**56.** As to McClammy's contention that he was not afforded a name-clearing hearing, the evidence reflects that the State Board orally and by letter offered McClammy a name-clearing hearing.

 

my did not have a property interest in his employment.

 In addition to his procedural due-process claim, Dr. McClammy also contends that his termination violated his substantive due-process rights under the fourteenth amendment. In *McKinney v. Pate,* the Eleventh Circuit Court of Appeals stated that the only areas protected by substantive due process are fundamental rights established under the Constitution that are " 'implicit in the concept of ordered liberty.' " 20 F.3d 1550, 1556 (1994) (en banc), *cert. denied,* 513 U.S. 1110, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995) (*quoting Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937)). "Areas in which substantive rights are created only by state law (as is the case with tort law and employment law) are not subject to due substantive due process protection under the Due Process Clause." In this case, Dr. McClammy does not allege any violation of a fundamental right established under the Constitution, and his substantive rights claims are based on state employment law. Therefore, the court concludes that Dr. McClammy is not subject to substantive due-process protection.

### C.  *Violation of Shuford Consent Decree*

 Dr. McClammy alleges that in terminating his employment, defendants violated the letter and spirit of the consent decree established in *Shurford I.* A remedial court order does not serve as an independent basis for liability under § 1983. "Remedial decrees are the means by which unconstitutional conditions are corrected, but they do not create or enlarge constitutional rights." *Green v. McKaskle,* 788 F.2d 1116, 1123 (5th Cir.1986). Therefore, the court concludes that the consent decree here did not give McClammy any more rights than he already had under Title VII, and the court has already found that his rights under Title VII were not violated.

 In addition, Dr. McClammy alleges that his termination violated the spirit of the decree by thwarting accomplishment of the goals for hiring blacks into the postsecondary

*See* Exhibits B–6 and B–7 to defendants' motion

system.    This argument is without merit. The goals in the consent decree should not be construed to limit the discretion of the State Board in disciplinary matters, so long as the Board acts in compliance with applicable non-discrimination laws.    Because the Board has complied with non-discrimination laws, the court finds that the spirit of the decree has not been violated—indeed, it has been served.

An appropriate judgment will be entered granting defendants' motion for summary judgment.